Thomas Patrick WALSH,
Plaintiff–Appellee,

v.

Nicholas MELLAS and Harry Martin,
Defendants–Appellants.

No. 86–2413.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1987.

Decided Jan. 21, 1988.

---

Bret A. Rappaport, Asst. Atty. Gen., Chicago, Ill., for defendants-appellants.

Don R. Sampen, Jenner & Block, Chicago, Ill., for plaintiff-appellee.

Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Defendants Nicholas Mellas and Harry Martin, prison officials at the Stateville Correctional Center, appeal the district court's award of $2,500 compensatory and $5,000 punitive damages in favor of a Stateville inmate, Thomas Walsh. We affirm.

## I.

■ The plaintiff-appellee Thomas Patrick Walsh ("Walsh"), a state prisoner currently serving sentences for three felony convictions, brought this action against six Stateville officers pursuant to 42 U.S.C. § 1983 (1976) after Walsh was assaulted by his cellmate (Frank Lee) at the Stateville Correctional Center in 1979 while both were confined in the "investigative status" area of the prison.[1] The trial judge, after conducting a bench trial on his Eighth and Fourteenth Amendment claims,[2] ruled that placing a gang member in Walsh's cell constituted deliberate indifference toward Walsh's safety in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Even though the trial court found the defendants Mellas and Martin were the two officials primarily responsible for inmate security at Stateville therefore responsible for the constitutional violation, it also ruled that since their conduct was not the proximate cause of the injuries sustained, they were not liable for damages. The court went on to hold that the four other defendants did not violate Walsh's constitutional rights.

1. Inmates assigned to "investigative status" are ordinarily under investigation for a violation of prison rules, or are there for security reasons. Those inmates are placed in cells separate from the general prison population. The district court described the procedure for the double-celling of inmates assigned to investigative status as follows:

"The procedure established to deal with an inmate's request for 24–hour lockup for protective security reasons was as follows: An inmate would request transfer and receive a resident information report, or 'ticket.' In the ticket, the inmate would be cited for the technical violation of refusing his housing assignment. He would then be 'walked' to cellhouse B by a lieutenant. At cellhouse B the inmate was first held in a holding area, while the cellhouse keeper made a cell assignment.

Cellhouse B had two-man cells. They housed persons on investigative status and protective custody overflow from cellhouse E. An inmate issued a ticket because he was 'walked' to cellhouse B East in order to gain greater personal security by 24–hour lockup was, by the procedures then in force, a person under investigation for a violation and was, therefore, in cellhouse B East in investigative status. He was no longer, in practice, considered to be in protective custody on the ground that he had 'voluntarily' removed himself from that status. There were some restrictions on double-celling of persons in segregation because of adjudicated rules violations, including a requirement that the restrictions did not apply to persons being held on investigative status pending a determination of whether or not there had been a violation. While the cellhouse keeper may have made subjective evaluations of suitable double assignments, based on size, his experience with the inmates then in his charge, and the like, no effort was made to determine specific protective custody needs, checking central records, seeking information concerning specific protective custody needs, screening to reduce the likelihood of violence between cellmates—those simply were not part of the procedure."

(Order of District Court, at p. 2–3).

2. On the facts of this case the relevant constitutional provision is not the Due Process Clause of the Fourteenth Amendment, but is, instead, the Eighth Amendment. "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 245, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Because Walsh was incarcerated and there had been a formal adjudication of guilt against Walsh at the time of his attack, the Eighth Amendment applies.

Walsh's appeal of the district court's decision led to our first opinion in this case, *Walsh v. Brewer*, 733 F.2d 473, 475 (7th Cir.1984) ("*Walsh I*"). The court summarized the facts as follows:

> "Walsh was incarcerated at Menard in 1973. While at Menard, Walsh helped officials repulse an attack on a prison office by inmate members of street gangs. After this incident, members of the Disciples and Vice Lords gangs at Menard threatened Walsh. Walsh later was released from Menard.
>
> In 1978 Walsh was sent to Stateville to serve sentences for three felony convictions. Because Walsh feared that gang members at Stateville would retaliate against him for his role in the Menard incident,

Walsh asked prison officials to put him in protective custody in Cell House E. The prison officials granted Walsh's request. Walsh still feared for his safety in Cell House E, though, and he asked to be transferred to another prison. Stateville officials denied his request. Walsh then asked to be placed on twenty-four hour lockup in Cell House B, which housed inmates who violated a prison rule or were awaiting a disciplinary committee hearing. Some inmates apparently believed that twenty-four hour lockup was more secure than protective custody, and thus they would commit a technical violation of prison rules to gain admittance to twenty-four hour lockup. In order to be assigned to Cell House B, therefore, Walsh improperly refused his cell assignment and was charged with a disciplinary violation. Walsh was placed in Cell House B on January 24 or 25, 1979.

Stateville officials regularly assigned two men to a cell in Cell House B. Before double-celling inmates guilty of rules violations, officials were required by regulation to determine the prisoners' compatibility by checking their prison files. Prison officials, however, did not apply this regulation to inmates awaiting disciplinary hearings. In these cases, the cell house keeper made double assignments based on his evaluation of the inmates' size and his experiences with the inmates.

The Cell House B keeper assigned Walsh to an empty cell. On January 25, the keeper assigned another inmate, Frank Lee, to Walsh's cell. Lee was a Vice Lords gang member. Defendant Edward Franklin, a lieutenant, took Lee to the cell. Walsh testified that he immediately asked Franklin not to put Lee in the cell; Franklin testified that he could not recall Walsh making such a request. Walsh stated at trial that early the next morning, Lee stabbed him in the back and strangled him into unconsciousness with a wire.

> At noon, the prison Adjustment Committee came to Walsh's cell to adjudicate his disciplinary charge. Defendants Daniels, Drew, and Nelson were the committee members. Walsh testified that he showed the committee members his stab wounds and requested immediate medical attention. The defendants all testified that they neither saw stab wounds nor observed anything unusual about Walsh. The defendants did agree that Walsh asked to go to sick call, and Daniels stated that he conveyed Walsh's request to the cell house keeper in accordance with standard Stateville procedures.
>
> Later that afternoon, Lee assaulted Walsh by repeatedly strangling him with a wire. Prison officials found Lee standing over Walsh with a wire around Walsh's neck. The officers sent Walsh first to the Stateville emergency room, and then to a hospital in Joliet for two days."

This court also summarized the district court's findings with respect to the proximate cause issue:

> "The [district] court stated: 'Plaintiff does not suggest that Lee ever knew plaintiff was a Vice Lords target. The cause of the attack was unrelated to the 1973 Menard incident; Lee attacked Walsh, but not as a vengeful gang member.' R. 79, at 5. The district court further ruled that *prison officials would not have known that Lee was likely to attack Walsh for other reasons even if they had consulted Lee's files.* The court noted that Lee's file showed that he had no history of assaultive behavior at Stateville. In addition, the court de-

clined to assume that Lee's psychological evaluation, which described him as 'sullen, antagonistic, angry, dangerous, explosive, completely peer-oriented,' *would have alerted officials that Lee was more dangerous than many of the other inmates at the Stateville maximum security facility."*

733 F.2d at 476 (emphasis added). In *Walsh I*, the panel held that the district court's "finding that prison officials would not have been alerted to the danger of placing Lee with another inmate had they examined Lee's file ...," 733 F.2d at 476, was not clearly erroneous. The court also affirmed the trial judge's holding that defendants Franklin, Daniels, Drew, and Nelson did not violate Walsh's constitutional rights. 733 F.2d at 477. However, the Circuit Court in its opinion stated that the "district court's legal analysis is incomplete." *Id.* at 476. As the *Walsh I* panel expressed:

"The district court's order *does not discuss whether the evidence showed that the inmates at Stateville were exposed to an unconstitutionally high risk* of harm, and thus we vacate and remand the court's decision for further consideration of the evidence. To show that the *Stateville procedures* were unconstitutional, the record must indicate either that assaults occurred so frequently that they were 'pervasive,' ... or that Walsh belonged to an 'identifiable group of prisoners' for whom 'risk of ... assault [was] a serious problem of substantial dimension.'"

*Id.* at 476 (emphasis added). This court vacated "that portion of the court's decision concerning defendants Mellas and Martin," and remanded for consideration of the possibility that Stateville's procedures were inadequate in the protection of inmates confined in "investigative" status against the risk of assault in light of the panel's guidelines set forth above. *Id.* at 477. Finally, the appellate court directed the district court to award "appropriate" damages if it determined that Stateville's procedure for screening inmates assigned to investigative status was unconstitutionally defective. *Id.*

Upon remand, the trial judge applied the *Walsh I* standard and explained and reaffirmed its finding of liability, reasoning that the inadequacy of the prison's screening procedures amounted to a deliberate indifference to Walsh's right to security. The court explained its holding in the following manner:

"The Court of Appeals ruled that the evidence must indicate either that assaults occurred so frequently that they were 'pervasive,' or that Walsh belonged to an 'identifiable group of prisoners for whom risk of assault (was) a serious problem of substantial dimensions,' Walsh v. Brewer, 733 F.2d 473, 476 (7th Cir.1984). There was considerable evidence respecting the frequency of assaults. This Court's ruling was not based, however, on that evidence. Rather, it was based upon the evidence that gang activity was a serious security problem at Stateville at the time, as was known by the two defendants; that the risk of assault by gang members upon inmates targeted by gangs was real and significant; that plaintiff was, and was known to be such a targeted inmate and therefore a member of a identifiable group of prisoners for whom risk of assault was a serious problem; and that the two defendants, Mellas and Martin, devised and operated a security system which ignored that risk in that targeted inmates in investigative status were housed with other prisoners without any determination of whether those other prisoners were members of a vengeful gang."*

R. 97, at 2 (emphasis added). As the italicized portion of the paragraph indicates, the district court relied on the second theory of liability set forth in *Walsh I*: Walsh's association in an "identifiable group of prisoners for whom the risk of assault is a serious problem of substantial dimension."

Based upon its findings of liability, the trial court awarded Walsh $2,500 for the "personal humiliation and mental anguish and suffering caused by the constitutional violation." R. 97, at 4. The court also concluded that because Mellas and Martin's

conduct rose to the level of reckless indifference to Walsh's constitutional rights, an award of $5,000 in punitive damages was appropriate. *Id.* Mellas and Martin appeal these findings.

## II.

Initially, the defendants maintain that the district court failed to apply the proper Eighth Amendment standard when determining that the prison's screening procedures violated Walsh's rights. They contend that once a district court finds that the plaintiff is a member of an identifiable group of inmates placed "at risk" of an inmate attack, the plaintiff is also required to demonstrate that the defendant's conduct is so culpable as to rise to the level of "punishment" under the Eighth Amendment. *Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986), details the level of culpability necessary for a finding of an Eighth Amendment violation.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual *punishment* inflicted." (Emphasis added). In *Duckworth,* the court emphasized that the mistreatment of prisoners will only rise to the level of *punishment* for Eighth Amendment purposes if "the indifference to a prisoner's welfare [is] deliberate." 780 F.2d at 653 (citing *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *Jones v. Morris,* 777 F.2d 1277, 1280 (7th Cir.1985)). The court stated:

> "If the word 'punishment' in cases of prisoner mistreatment is to retain a link with normal usage, *the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense. Gross negligence is not enough.* Unlike criminal recklessness it does not import danger so great that knowledge of the danger can be inferred; and we remind that the 'indifference' to the prisoner's welfare must be 'deliberate,' e.g., *Estelle*

*v. Gamble, supra,* 429 U.S. at 104, 97 S.Ct. at 291; *Jones v. Morris, supra,* at 1280, implying such knowledge. Although some cases contain language more suggestive of the tort definition of recklessness than of the criminal law definition, *see, e.g., Benson v. Cady, supra,* 761 F.2d [335] at 339–40 [7th Cir.1985]; *Estate of Davis v. Johnson,* 745 F.2d 1066, 1071 (7th Cir.1984); *State Bank v. Camic,* 712 F.2d 1140, 1146 (7th Cir. 1983), they are cases where the prisoner had failed to prove recklessness even in the tort sense, and it was not important therefore whether he would have had to prove even more in order to win the case."

780 F.2d at 652–53 (emphasis added). The distinction drawn in *Duckworth* between "gross negligence" and "reckless disregard" limits the type of factual situations subject to the Eighth Amendment.

In *Estelle,* for example, the Supreme Court held that a prison doctor's failure to order an X ray of plaintiff's lower back did not violate the Eighth Amendment even though it might have amounted to an act of medical malpractice. 97 S.Ct. at 293. The Court explained:

> "But the question whether an X-ray or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel or unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act."

*Id.* Although the failure to order an X ray might, under certain circumstances, be considered negligent, the Court held that:

> "in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.

Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."*

93 S.Ct. at 292 (emphasis added).

In *Duckworth, supra,* a bus used to transport prisoners between prisons within the state of Illinois caught fire from causes unknown. When the fire broke out, the thirty-five prisoners in the bus were handcuffed together, and all exits of the bus except the front door were secured. Twenty-one of the injured prisoners sued three prison officials and three guards under § 1983, charging that the failure to take effective precautions against the danger of fire on the bus constitutes cruel and unusual punishment in violation of the Eighth Amendment. The Court of Appeals reversed a jury's finding of liability against three of the defendants, holding that since the plaintiffs presented no evidence of even a single previous instance of fire on a prison bus, no reasonable jury would conclude that the prison's failure to take precautions against the possibilities of fire was either deliberate or reckless. The court stated:

> "In the present case, *even if the defendants' conduct was negligent or even grossly negligent, a reasonable and properly instructed jury could not have found it sufficiently reckless to be called punishment.* To begin with, the danger of a serious accident, though plain enough in retrospect, was not believed to be great and was not objectively so great that Wolff's and Hert's actual knowledge of the danger can be inferred. There had never been a fire on a prison bus in Illinois. This bus had been in service without incident for more than a year before the fire. The plaintiffs' able counsel presented no evidence of even a single instance in the history of this country (or for that matter any other country) of a fire on a prison bus or other vehicle in which someone was being transported under restraint. Obvi-

ously there have been such fires but they must be exceedingly rare."

780 F.2d at 649 (emphasis added).

In *Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.), *vacated and remanded on other grounds sub nom. Cannon v. Thomas,* 419 U.S. 813, 95 S.Ct. 288, 42 L.Ed.2d 39 (1974), this court held that a prison doctor inflicted cruel and unusual punishment upon a prisoner when he injected the inmate with penicillin in spite of the fact that he (the prisoner) had advised the doctor prior to the injection, that he was allergic to the drug. The difference in the court's decisions rests upon the fact that unlike the defendants in *Duckworth* and *Estelle,* the defendant in *Thomas* had actual knowledge of "an impending harm easily preventable." *Duckworth,* 780 F.2d at 653. As *Duckworth* points out, "punishment" for Eighth Amendment purposes implies at a minimum *actual knowledge* of such a harm, so that a conscious refusal to prevent the harm can be inferred from the defendant's actions (or inactions). *Id.* In determining whether a prison official's *inaction* constitutes conscious disregard for an inmate's safety, facts such as "a history of accidents or a previous request for repairs that had fallen on deaf ears" are important. *Id.* (*quoting Jones v. Morris,* 777 F.2d at 1280 n. 5).

■ In light of those guidelines, we analyze the defendants' contention that the district court failed to judge the defendants' conduct under the appropriate Eighth Amendment standard. The district court's order states:

> "[its holding] was based upon the evidence that gang activity was a serious security problem at Stateville at the time, *as was known by the two defendants;* that the risk of assault by gang members upon inmates targeted by gangs was real and significant; that plaintiff was, *and was known to be,* such a targeted inmate and therefore a member of an identifiable group of prisoners for whom risk of assault was a serious problem; and that the two defendants, Mellas and Martin, devised and operated a security system which ignored that risk in that targeted

inmates in investigative status were housed with other prisoners without any determination of whether those other prisoners were members of a vengeful gang. That, in this court's view, constituted deliberate indifference or reckless disregard of the prisoner's right to security."

(Emphasis added).

An examination of the trial court's written order makes clear that the judge considered the legal distinction between the legal test for deliberate indifference to a known hazard as contrasted with gross negligence; and that he applied the proper standard. The findings recited above emphasize that critical to the court's decision was its finding that: (1) officers Mellas and Martin had *knowledge* that "gang activity was a serious problem at Stateville at the time"; (2) the "risk of assault by gang members upon inmates targeted by gangs was real and significant"; (3) "the plaintiff was known to be such a targeted inmate and therefore a member of an identifiable group of prisoners for whom risk of assault was a serious problem"; and (4) that the two defendants "devised and operated a security system which ignored that risk...." In spite of the defendants' awareness of the general risk of gang-related violence against individuals targeted by gangs, the record demonstrates that they failed to institute procedures and safeguards in an attempt to determine whether an inmate to be housed with a gang member is targeted by that gang. In the face of the known risks of gang-related attacks at Stateville, the defendants' failure to establish a procedure for the screening of the file of an inmate to be assigned to the "investigative status" area of the prison to ensure some level of compatibility with his cellmate supports the trial judge's conclusion that the defendants exhibited the kind of "deliberate indifference" to a prisoner's

right to security that in this court's view amounts to "punishment" under the *Duckworth* standard. *See also Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1093–94 n. 10 (7th Cir.1986).[3]

■ Furthermore, the district court tracked the law set forth in *Walsh I.* In reaching its legal conclusions, it was indeed proper for the trial court to follow the panel's statement of law as establishing the "law of the case." *See Soderbeck v. Burnett County, Wisconsin*, 821 F.2d 446, 449–50 (7th Cir.1987). Under that doctrine, "we have long held that 'matters decided on appeal become the law of the case to be followed ... on second appeal, in the appellate court unless there is plain error of law in the original decision.'" *Soderbeck*, 821 F.2d at 449 (quoting *Appleton Electric Company v. Graves Truck Line, Inc.*, 635 F.2d 603, 607 (7th Cir.1980)). In *White v. Murtha*, 377 F.2d 428, 431 (5th Cir.1967), the court summarized the doctrine of the law of the case:

> "The 'law of the case' rule is based on the salutary and sound public policy that litigation should come to an end, it is predicated on the premise that 'there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculative chances from changes in its members,' and that it would be impossible for an appellate court to perform its duties satisfactorily and efficiently and expeditiously 'if a question, once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal' thereof."

Nevertheless, this court has also stated that:

> "The law of the case doctrine, however, is not an immutable concept, and should

---

**3.** In *Shelby County Jail*, 798 F.2d at 1093–94 n. 10, we approved the following jury instruction: *"... In order to show callous indifference, plaintiffs must prove the existence of a 'pervasive risk of harm' from other inmates, and that jail officials failed to reasonably respond, knowing of that risk.* A pervasive risk of harm may be established by proving that violence or sexual assaults occur with sufficient frequency that inmates are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures. Once a pervasive risk has been established, it must be determined whether the jail officials reasonably responded to that risk."

not be applied where the law as announced is clearly erroneous, and establishes a practice which is contrary to the best interests of society, and works a manifest injustice in the particular case...."

*Devines v. Maier,* 728 F.2d 876, 880 (7th Cir.1984) (citations omitted). Although the doctrine of the law of the case is not absolute, the parties fail to convince us to reject it. As explained previously, *Duckworth* requires that a plaintiff establish a "knowing indifference to a risk that is easily preventable," a standard which is entirely consistent with the "identifiable group" theory of liability articulated in *Walsh I.* Consistent with *Duckworth,* the identifiable group theory requires the plaintiff to demonstrate a pattern of assaults upon an identifiable group, so that a conscious refusal to prevent the harm can be inferred. 780 F.2d at 653. *Walsh I,* under the facts of that case, provides a more specific theory of liability under the Eighth Amendment than the *Duckworth* standard: the *Walsh* guidelines are tailored to the situation where a prison's practices and *procedures* for screening the files of inmates assigned to investigative status to determine their involvement in gang-related activities arguably violates the Eighth Amendment. Following the law of the case doctrine, the district judge properly applied the standards set forth in *Walsh I.*

Additionally, the defendants maintain that even if the court utilized the correct legal standard, its application of the facts to that standard were erroneous. The defendants face a most difficult obstacle with this type of argument, since we overturn a district court's factual findings only if they are clearly erroneous. Fed.R.Civ.P. 52(a). Under the "clearly erroneous" standard, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). "The clearly erroneous standard insures that the trial on the merits is 'the main event ... rather than a tryout on the road.'" *AMP, Inc. v. Fleischhacker,* 823 F.2d 1199, 1207 (7th Cir. 1987).

▮ Initially, the defendants argue that the record is devoid of any evidence that either Mellas or Martin had knowledge that placing Lee (a gang member) in Walsh's cell would put Walsh at the risk of an assault. Their argument essentially attacks the court's factual finding that Walsh was "a member of an identifiable group of prisoners for whom the risk of assault was a serious problem of substantial dimensions." *Walsh I,* 733 F.2d at 476. For instance, the defendants refer to Mellas' self-serving testimony that he never intended to place *Walsh* with a dangerous cellmate. Further, Martin testified that he neither knew Walsh, nor did he knowingly expose Walsh to the risk of assault.

Even assuming the truth of that testimony, it evades the point: while the defendants may not have intended to harm Walsh, their failure to respond to the known danger of assault upon a member of an identifiable group of prisoners that are targeted by gangs, with the institution of reasonable screening procedures and safeguards to protect the safety of prisoners from the risk of gang-related violence reaches the Eighth Amendment standard of liability—deliberate indifference to a known hazard—set forth in this court's decision in *Walsh I.* Additionally, following *Duckworth,* the danger of physical assault on a prisoner targeted by gangs was "easily preventable," 780 F.2d at 653; a good faith screening procedure similar to the one utilized for the general population, involving a review of the inmate's files before assigning him a cell or work-detail partner, would most likely reveal if the inmate had a history of previous gang-related activities, and this type of review would have helped to insulate the defendants from a finding that the prison's classification and assignment *procedures* were unconstitutional.

▮ Defendants contend that there is neither enough time nor manpower to screen all the files of inmates assigned to

the "investigative status" area of the prison. Excuses of this nature fall on deaf ears when dealing with real and obvious threats to human life in many maximum security prisons. We recognize that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions .... [and that p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). We firmly believe that the failure of prison authorities to even review an inmate's file to determine his or her proclivity for violence and/or whether they are a gang-target in the face of gang-related threats and violence manifest utter disregard for the value of human life. This we will not condone, for in America we respect the sanctity of human life, including those confined in penal institutions.

The increased administrative burden that the defendants assert a decision in Walsh's favor would impose upon the prison system is inconsequential when compared with the value of a proper screening process protecting human life and curbing gang-related violence. Defendants concede that some on-the-spot screening of an inmate's size and experience with other inmates is currently performed with respect to the more permanent housing of double-celled inmates. The added burden of reviewing the inmate's file is not substantial. We agree with the district court that pursuant to *Duckworth,* the fact that "the plaintiff was, and was known to be ... a targeted inmate and therefore a member of an identifiable group of prisoners for whom risk of assault was a serious problem; and that the two defendants, Mellas and Martin, devised and operated a security system which ignored that risk in that targeted inmates in investigative status were housed with other prisoners without any determination of whether those other prisoners were members of a vengeful gang," triggers an Eighth Amendment violation.

We thus consider whether the trial court's factual finding that the "plaintiff was and was known to be such a targeted inmate [targeted by gangs] and therefore a member of an identifiable group of prisoners for which risk of assault was a serious problem" is "plausible in light of the record viewed in its entirety." *Anderson,* 105 S.Ct. at 1511–12. The plaintiff testified that he had received numerous threats from gang members while in Cell House E, and that he repeatedly conveyed the information concerning these threats to prison officials. Plaintiff went so far as to write a letter to his counselor about the gang threats, and testified that the letter was placed in his master file. The evidence further supported the belief that Lee was known to prison officials as a gang leader; a report identifying him as such was contained in his master file. Information that is most detrimental to the defendants' cause is that Lee had a tattoo "VL" on his chest, which short of an ad campaign, could not have more clearly advertised and made known to all his Vice Lords' gang affiliation. The tattoo certainly should have been obvious and noted on the prisoner's record by those prison employees who gave Lee a physical upon his reception at the institution before assignment. Given these clear indications of Lee's gang-related activities and the documented threats to Walsh from gang members contained in Walsh's personnel file, the defendants' assertions that they were justifiably unaware of the danger to Walsh posed by gang members rings hollow. Additionally, the record supports the district court's finding that the risk of gang-related attacks was a serious problem at Stateville. Documentary evidence introduced by the plaintiff supports the district court's conclusion that violence was rampant at Stateville and that gang influence pervaded the institution.[4] Based upon the totality of the evidence, the

4. Plaintiff's Exhibit No. 290, is a study dated February 25, 1980 done by the John Howard Association, a prison watchdog group, entitled "Stateville Revisited: 'Shakedown/Shakeup—One Year Later.'" Plaintiff relies upon the statistics contained in this study in his attempt to

district court found that there was "considerable evidence respecting the frequency of assaults ... and that the risk of assault by gang members upon inmates targeted by gangs was real and significant." Because there is ample evidence in the record in support of this conclusion, we refuse to hold that it is clearly erroneous. While much of the evidence supporting the court's conclusion consisted of the plaintiff's testimony, that testimony was often corroborated with documentary evidence (e.g. letters and reports contained in his file). The trial judge's conclusion was more than "plausible in light of the record viewed in its entirety," *Anderson*, 105 S.Ct. at 1511–12, and hence, was not clearly erroneous.

### III.

 Defendants next maintain that they are entitled to qualified immunity based upon their good-faith compliance with the law as it existed in 1979, when the attack against Walsh occurred. *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because this issue is raised for the first time in the *second* appeal of this case, the question of waiver must be addressed.[5] As with other affirmative defenses upon which the defendants bear the burden of proof, *see Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736; *cf. Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir.1987), the defense of qualified immunity may be deemed as waived if not properly and timely presented before the district court. In *Walsh I*, the defendants "raised"[6] the defense in their answer to plaintiff's complaint, but failed to bring the argument to the court's attention, despite their having had numerous opportunities to do so.[7] The cases holding that an omission of this char-

establish the defendants' knowledge of the danger of gang-related attacks at Stateville. For instance, the study reports that there were 37 *reported* instances of inmate-on-inmate assaults during the period July '78 through Jan. '79, and 61 reported instances of inmate-on-officer assaults. (Plaintiff's Exhibit No. 290, at p. 16). The study also reveals that a subsequent reorganization of the prison resulted in a decline in both inmate-on-inmate and inmate-on-officer assaults (to 18 and 51 respectively) the following year. Information before July of 1978 was not available. But between January '79 and January '80, the number of disciplinary "tickets" issued by the staff increased by 100% from approximately 1,000 per month to over 2,000 per month. (Ex. 290, at p. 10). The study also found that gang influence remained a problem. (*Id.* at p. 3).

5. The plaintiff raised the waiver issue for the first time at the appellate level, because the defendants failed to press the qualified immunity defense before the district court. At oral argument, plaintiff's counsel argued that the defendants should have pressed the qualified immunity defense in the *Walsh I* appeal to avoid waiver of the defense. As explained in the text of this opinion, however, the defendants waived their right to this defense because they did not press the issue before the district court in *Walsh I*, and raised it for the first time on this appeal.

6. A single sentence in their seven-page answer states "Defendants, Nicholas Mellas, Harold Daniels, Mark Nelson, and Walter E. Drew, were acting in good faith within the scope of their duties and responsibilities." (R. 8 at p. 7). Defendants Martin and Franklin, in their separate answer, adopted the defense. It was nei-

ther referred to in the brief nor the argument before the trial court.

7. The defendants filed a number of motions in *Walsh I*, both before and after trial, and there were numerous hearings during which they could have presented the qualified immunity issue had that been their intention. The most appropriate time to raise the issue, of course, would have been in their motion for summary judgment, filed almost fifteen months after the action was initiated. In *Harlow*, the Court stated:

"Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many substantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed."

102 S.Ct. at 2738. The defendants' summary judgment motion, however, failed to contain even a passing reference to qualified immunity. Just this term, the Supreme Court again emphasized what has always been the central purpose of the qualified immunity defense: "To protect public officials from the 'broad ranging dis-

acter constitutes a waiver of the right to present that issue on appeal are legion. *See, e.g., National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 360 (7th Cir. 1987); *Ohio Cas. Ins. Co. v. Bazzi Const. Co., Inc.*, 815 F.2d 1146, 1149 (7th Cir. 1987); *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 268 (7th Cir.1986). The mere fact that an obscure reference to defendants' "good faith" is contained in one of the defendants' pleadings does not suffice to preserve that issue for appeal. "[A] trial judge may properly depend upon counsel to apprise him of the issues for decision. He is not obligated to conduct a search for issues which may lurk in the pleadings." *Libertyville Datsun Sales, Inc. v. Nissan Motor Corp.*, 776 F.2d 735, 737 (7th Cir. 1985) (quoting *Desert Palace, Inc. v. Salisbury*, 401 F.2d 320, 324 (7th Cir.1968)). It is clear from our review of the district court proceedings in *Walsh I* that defendants abandoned the defense.

■ Additionally, the qualified immunity defense was not raised on appeal in support of the district court's holding in *Walsh I*. Defendants contend that the failure to press the issue on appeal is excusable since they were at the time *defending* a district court decision that did not address the issue of qualified immunity. True, the district court did not address the issue, for the parties failed to raise their possible immunity at trial. Defendants' excuse—that they did not raise the issue in the *Walsh I* appeal because the district court did not decide the case on that ground—does not cure the initial problem, for had they lost in the district court, they still would have been precluded from advancing the qualified immunity defense on appeal because of their failure to raise the issue in the trial court. Once district court proceedings conclude and a defendant fails to raise an affirmative defense, the defendant simply forfeits his or her right to assert that defense on appeal. *National Fidelity*, 811 F.2d at 360. Consequently, defendants' as-

sertion of the defense of qualified immunity on remand from *Walsh I*, which still did not occur until *after* the district court's final decision (upon a motion to alter or amend judgment), and in this second appeal, comes too late. Application of the waiver rule is particularly *apropos* in a case such as this where:

"... factual questions may have been implicated as to which the judge made no finding because the issue was not directly raised and equally, where consideration underlying a subtle legal issue could have been exposed and distilled by the district court so as to facilitate more informed consideration by [an appellate] court."

*Johnson v. Artim Transp. System, Inc.*, 826 F.2d 538, 547–48 (7th Cir.1987) (quoting *Terkildsen v. Waters*, 481 F.2d 201, 204–05 (2d Cir.1973)).

There are, of course, narrow exceptions to the waiver rule. A ground for reversal may be raised for the first time on appeal "when the issue presented goes to the district court's subject-matter jurisdiction, if the district court's decision is 'plain error,' ... or if there are exceptional circumstances where justice demands more flexibility." *Johnson*, 826 F.2d at 548 (citations omitted). The reasons set forth by defendants' counsel fail to meet any of the exceptions to the waiver rule.

With respect to the first exception, our jurisdiction over the subject matter of this lawsuit has not been challenged by the defendants, nor have we found any jurisdictional defect. Thus, although issues of subject matter jurisdiction can be raised *sua sponte* at any time whenever a problem becomes evident, *see Clift v. United Auto Workers*, 818 F.2d 623, 626 (7th Cir. 1987), we need not discuss this issue.

■ The defendants argue that the district court's refusal to extend qualified immunity to Mellas and Martin engendered "plain error." Under the qualified immuni-

---

covery' that can be particularly disruptive of effective government. For this reason, we have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, —— U.S.

——, 107 S.Ct. 3034, 3042 n. 6 (quoting *Harlow, supra*, 457 U.S. at 817, 102 S.Ct. at 2737–38 (1982)). Defendants' delay in pursuing the qualified immunity issue has frustrated these important goals.

ty doctrine, government officials performing discretionary functions are shielded from civil damages liability as long as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton,* — U.S. ——, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Defendants contend that immunity should be extended to them since the "identifiable group" theory of liability that the district court utilized did not exist prior to when the Fourth Circuit decided *Withers v. Levine,* 615 F.2d 158 (4th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980), a year after the incident in question. We disagree. In our view, the parameters of the "right" that the defendants violated are sufficiently clear in light of prior decisional law. *See, e.g., Spence v. Staras,* 507 F.2d 554 (7th Cir.1974) (court held that prison officials have a constitutional duty to take measures to protect against inmate-on-inmate attacks). Although the precise prison practice before us—the lack of a proper procedure for screening the files of prisoners to determine their involvement with gangs before they are assigned a cellmate in the "investigative status" area of the prison—has never been held unlawful, a precisely analogous case holding this practice unlawful is not what is required to pierce an officer's immunity: liability may be imposed where, in light of preexisting law, the unlawfulness is apparent. *See Anderson,* 107 S.Ct. at 3034. It was not "plain error" for the district court to deny Mellas and Martin qualified immunity.

Finally, defendants have failed to bring to our attention, nor have we discovered in our review of the record, any "exceptional circumstances where justice demands more flexibility" in the application of the waiver rule. We conclude that the defendants have waived the issue of immunity.

## IV.

Defendants' last argument is that the district court's award of punitive damages was improper since Walsh neither demonstrated intentional or deliberate indifference to his federally protected rights. *See*

*Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). They argue that because the defendants "did not violate any statutes, rules and regulations ... [and because they] acted according to established procedures when they placed Lee in Walsh's cell, [t]he policy of punitive damages [punishment and deterrence] is not furthered by the district court's award in this case." (Appellant's brief, at p. 25). Plaintiff responds that the district court appropriately relied upon the Supreme Court's decision in *Smith v. Wade, supra,* when it awarded punitive damages. Further, plaintiff maintains that the fact that the defendants acted according to procedures established by them does not excuse their reckless failure to institute constitutionally adequate safeguards.

We disagree with the defendants' argument that their non-violation of prison rules precludes an award of punitive damages when the adequacy of the prison's procedures themselves are in issue. Were we to accept defendants' contention that compliance with established procedures prevents a punitive damage award, the institution of severely inadequate rules and regulations could not be deterred through the threat of punitive damages. Because this case involves the Eighth Amendment, the level of culpability required for a liability finding is the same as the punitive damage standard: both require a determination that the defendants acted with deliberate indifference or reckless disregard for the plaintiff's right to security. *Compare Duckworth,* 780 F.2d at 652–53 ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either *deliberate, or reckless in the criminal law sense.*") *with Smith,* 103 S.Ct. at 1637 ("... based on the policies of § 1983, we are content to adopt the policy judgment of the common law— that *reckless or callous disregard* for the plaintiff's rights ... should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages.") Because the standard required to demonstrate an Eighth Amendment violation meets the punitive damages standard, Walsh's success in establishing that the defendants' conduct

violated the Eighth Amendment in that it amounted to a deliberate indifference or reckless disregard for Walsh's right to safety, also suffices to sustain an award of punitive damages. We decline to second-guess the district court's award of punitive damages in the amount of $5,000.

The judgment of the district court awarding the plaintiff Walsh both compensatory and punitive damages is AFFIRMED.