Frank JAMES, Plaintiff–Appellant,

v.

**MILWAUKEE COUNTY and Franklin Lotter, Defendants–Appellees.**

No. 91–1497.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1991.

Decided Feb. 12, 1992.

Arthur W. Aufmann, argued, Law Offices of Merle Royce, Chicago, Ill., Thomas K. Archie, Milwaukee, Wis., for plaintiff-appellant.

Mary Ellen Poulos, argued, Milwaukee, Wis., for defendants-appellees.

Before WOOD, Jr. and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

On April 10, 1988, a dispute erupted between Willie Hannah and Frank James, two inmates at the Milwaukee County House of Correction (HOC). Hannah, the larger of the two men, apparently attacked James over an outstanding gambling debt. In the ensuing struggle, Hannah grabbed James' head with his bare hands and broke his neck, rendering him a quadriplegic. James filed suit, not against the perpetrator of this assault, but under 42 U.S.C. § 1983 against Milwaukee County and its prison officials for allowing the assault to occur under their watch. James alleges that the County's inmate classification system, under which parole violators and probation violators are housed in the same open dormitories without regard to criminal history, is cruel and unusual punishment under the eighth amendment.[1]

I.

James was originally convicted for a single count of theft, a non-violent misdemeanor against property, and received *probation* in lieu of prison time. He subsequently violated the terms of his probation and was sent to prison. Hannah, by contrast, was originally convicted of three counts of sexual assault, a violent felony against persons, and served part of his sentence for those crimes before a grant of *parole*. Hannah was back in prison for violating the terms of his parole at the time of his encounter with James. Both James and Hannah were classified as probation/parole violators and assigned to the "H dorm," an open, medium security dormitory of 60 inmates under the supervision of one guard.

James asserts that he and Hannah should never have been housed together. He contends that the defendants' inmate classification policy created a substantial risk of violence by permitting violent felons (like Hannah) and non-violent misdemeanants (like James) to be assigned to the same dormitory. James argues that a meaningful classification system would, at minimum, separate parole violators from probation violators, thereby reducing inmate violence. The unstated premise of this argument is that an inmate's status as a parole violator (versus a probation violator) accurately reflects propensity for violence behind bars. Presumably this is so because parolees, unlike probationers, were given prison time and hence must have committed a crime serious enough, or had a criminal history serious enough, to warrant incarceration in the first place. Conversely, under this reasoning, probationers were granted clemency after conviction and never served time, presumably because their crime was less serious or because they had a less serious criminal history. According to the plaintiff, non-violent inmates like James (a convicted thief) are more suscepti-

---

1. James premised his original complaint on an entirely different § 1983 theory; he alleged that the defendants acted with deliberate indifference to his physical safety by ignoring gang violence, as well as Hannah's coercive attempts to recruit him into a gang. One week before trial, James abandoned this theory of liability, filing an amended complaint premising liability on the inmate classification system.

ble to attack by violent inmates like Hannah (a convicted rapist).

In support of his claim, James offered the testimony of expert witness John Buckley, a former prison superintendent. Buckley testified that, to reduce prison violence, an effective classification system should separate inmates as follows: parole violators from probation violators, felons from misdemeanants, inmates convicted of crimes directed at people from those convicted of crimes directed at property, and inmates with violent criminal records from those with non-violent records. Buckley further testified that these classification criteria have been universally accepted throughout the United States and Western Europe and that, of the 150 correctional facilities he has inspected, nearly all employed some classification designed to separate violent criminals from non-violent criminals. In addition to this expert testimony, James points out that a consultant hired by Milwaukee County in 1987 recommended that it discontinue the practice of housing parole and probation violators together.

In response, the defendants argue that James failed to present any concrete evidence of inmate violence at the HOC (aside from Hannah's assault of James) to support his claim that its inmate classification system spawns violence. James' expert witness testified only as to his view of the ideal inmate classification system—he was never asked to review statistical evidence of violence at the HOC, or to demonstrate a causal relationship between Milwaukee County's classification system and inmate violence. The defendants also maintain that inmates Hannah and James had more in common than not. Parole and probation are both acts of grace or clemency granted to a seemingly deserving defendant and both Hannah and James had recently been determined appropriate candidates for release into the community. Both were adult males and convicted criminals. Neither had been seriously disciplined while in the HOC and neither had a record of inmate violence in prison.

At trial, after James rested his case, the district judge granted the defendants' motion for a directed verdict, concluding that James had failed to show an eighth amendment violation and that the defendants' classification system passed constitutional muster as a matter of law. For the reasons offered below, we affirm.

## II.

We review *de novo* a district court's grant of a motion for directed verdict. *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir.1988). In doing so, we determine whether the evidence presented, combined with all reasonable inferences drawn from it, is insufficient to support the verdict when viewed in the light most favorable to the nonmoving party. *Id.* "The district judge is not to resolve conflicts in testimony or weigh and evaluate the evidence, functions that are reserved to the factfinder." *Id.* However, if the non-movant presents insufficient evidence upon which a reasonable person could properly base a verdict in his favor, judgment as a matter of law for the movant is appropriate. *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir. 1985). Moreover, a mere scintilla of evidence will not prevent a directed verdict. *Id.; see also La Montagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1410 (7th Cir.1984).

## III.

Relying on identical provisions in the English Bill of Rights of 1689 and the Virginia Declaration of Rights of 1776, the Framers of the eighth amendment sought, as its words suggest, to prevent judges and legislators from imposing on citizens barbarous or "cruel and unusual" forms of punishment. *See generally* Granucci, *Nor Cruel and Unusual Punishments Inflicted: The Original Meaning*, 57 Calif.L.Rev. 839 (1969). Consequently, the eighth amendment has long been thought to prohibit such inhumane punishment as torture, lingering death, *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890), drawing and quartering, disembo-

welling, and burning at the stake. *Wilkerson v. Utah,* 99 U.S. 130, 135–36, 25 L.Ed. 345 (1879). But beyond this, the Supreme Court has interpreted the eighth amendment "in a flexible and dynamic manner," *Gregg v. Georgia,* 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976) (joint opinion), to reach beyond the extreme physical punishments proscribed in early American history. Today it prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," *id.,* 428 U.S. at 173, 96 S.Ct. at 2925, or are grossly disproportionate to the severity of the crime. *Harmelin v. Michigan,* —— U.S. ——, 111 S.Ct. 2680, 2703, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring).[2] Thus, prison conditions involving the wanton and unnecessary infliction of pain, totally without penological justification, offend the constitution. *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981).

■ However, not all prison conditions trigger eighth amendment scrutiny—only deprivations of basic human needs like food, medical care, sanitation, and physical safety. *Id.; see also Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978); *Ingraham v. Wright,* 430 U.S. 651, 669, 97 S.Ct. 1401, 1411, 51 L.Ed.2d 711 (1977); *Inmates of Occoquan v. Barry,* 844 F.2d 828, 832 (D.C.Cir.1988); *cf. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). So, for example, a prisoner who is denied a pack of playing cards or a television set has not set out a deprivation of constitutional dimensions under the eighth amendment. Here the alleged deprivation is the right to physical safety, a right addressed by this Court on several occasions. *See, e.g., McGill v.*

*Duckworth,* 944 F.2d 344, 347 (7th Cir. 1991) (sexual assault); *Steading v. Thompson,* 941 F.2d 498, 500 (7th Cir.1991) (second-hand smoke), *petition for cert. filed,* —— U.S.L.W. —— (U.S. Dec. 9, 1991) (No. 90–2588); *Wilks v. Young,* 897 F.2d 896, 897–88 (7th Cir.1990) (inmate assaults); *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990) (same); *Goka v. Bobbitt,* 862 F.2d 646, 651 (7th Cir.1988) (tool control policy); *Richardson v. Penfold,* 839 F.2d 392, 394–95 (7th Cir.1988) (sexual assaults); *Walsh v. Mellas,* 837 F.2d 789, 794 (7th Cir.), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988) (inmate violence); *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986) (prison bus fire); *Benson v. Cady,* 761 F.2d 335, 339 (7th Cir.1985) (defective prison exercise equipment).

■ It is not disputed that James' physical safety was compromised while housed at the HOC. However, to prevail under contemporary eighth amendment standards, he must prove more—namely, that the defendants acted with the requisite mental state. This area of the law, which remained in flux for some time, was recently settled by the Supreme Court in *Wilson v. Seiter,* —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Because "the infliction of punishment is a deliberate act intended to chastise or deter," *Wilson,* 111 S.Ct. at 2325 (quoting *Duckworth,* 780 F.2d at 652), the Court concluded that intent is inherent in the use of the word "punishment." Negligence or even gross negligence is not enough; rather, plaintiffs must show *actual intent* or *deliberate indifference* on the part of state actors in order to make out an eighth amendment claim.[3] *See McGill,* 944 F.2d at 347.

**2.** Although not at issue in this case, the continuing vitality of the eighth amendment proportionality principle has been questioned. *See Harmelin,* 111 S.Ct. at 2691 (opinion of Scalia, J.).

**3.** Without addressing the deliberate indifference standard, James contends that he is entitled to a "reasonably safe prison environment." However, as the district court noted, the case on which he relies for this proposition, *Ryan v.*

*Burlington,* 889 F.2d 1286, 1293 (3d Cir.1989), is inapposite to the facts of this case. *Ryan* dealt with a pretrial detainee's due process rights under the fourteenth amendment and held that they had a right to a "reasonably safe prison environment." *Id.* at 1293. Whatever the merits of applying a reasonableness standard in the context of claims by pretrial detainees—a standard, we note, rejected in this Circuit, *see, e.g., Brownell v. Figel,* 950 F.2d 1285, 1290 n. 5 (7th Cir.1991)—it is abundantly clear that courts are

"Deliberate indifference" means *recklessness* in a criminal, subjective sense: disregarding a risk of danger so substantial that knowledge of the danger can be inferred. *See Duckworth,* 780 F.2d at 652. Such disregard is tantamount to intending that the injury occur. Put another way, recklessness in the context of prisoner safety requires "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *McGill,* 944 F.2d at 348 (quoting *Duckworth,* 780 F.2d at 653). A prisoner normally proves actual knowledge of impending harm by showing that he alerted prison officials to an identifiable threat to his safety. *McGill,* 944 F.2d at 349; *Santiago,* 894 F.2d at 223–24; *Goka,* 862 F.2d at 647–48; *Walsh,* 837 F.2d at 795–96, 798. Alternatively, a plaintiff can show, as noted above, the existence of so substantial a risk of harm that "the defendants' knowledge of the risk can be inferred." *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) (quoting *Duckworth,* 780 F.2d at 652); *see also Santiago,* 894 F.2d at 221 n. 6 (defendant acts recklessly "by consciously disregard[ing] a substantial and unjustifiable risk" of danger); *Goka,* 862 F.2d at 651 ("threat of violence is so substantial or pervasive" that knowledge can be inferred); *Estate of Davis v. Johnson,* 745

F.2d 1066, 1071 (7th Cir.1984) (to demonstrate callous indifference to inmate safety, plaintiff must show a "strong likelihood" of violence, not just a random act of violence); *accord Andrews v. Siegel,* 929 F.2d 1326, 1330 (8th Cir.1991) (to establish recklessness, must show officials faced with a pervasive risk of harm); *Moore,* 927 F.2d at 1315 (plaintiff must show deliberate indifference to a pervasive risk of harm); *Williams v. Willits,* 853 F.2d 586, 588 (8th Cir.1988) (plaintiff must demonstrate a pervasive risk of harm; a single incident does not demonstrate deliberate indifference); *Riley v. Jeffes,* 777 F.2d 143, 147 (3d Cir. 1985) (prison officials must demonstrate deliberate indifference to a pervasive risk of harm); *Fisher v. Koehler,* 692 F.Supp. 1519, 1560 (S.D.N.Y.1988) (plaintiff must show inmate violence is a substantial and widespread problem); *McGriff v. Coughlin,* 640 F.Supp. 877, 880 (S.D.N.Y.1986) (absent statistical evidence showing prison security policies resulted in increased violence, no deliberate indifference).

Although James' original complaint alleged actual knowledge, his amended complaint takes the latter approach, alleging instead inferred knowledge. He claims that Milwaukee's prisoner classification system created a pervasive risk of violence, and that the individual defendants ignored that risk.[4] James tried to demon-

---

to apply a deliberate indifference standard under the eighth amendment. *See Wilson,* 111 S.Ct. at 2325; *McGill,* 944 F.2d at 347; *see also Moore v. Winebrenner,* 927 F.2d 1312 (4th Cir. 1991) (rejecting a reasonableness standard under the eighth amendment).

4. James is suing the municipality and officials responsible for his incarceration rather than any of the prison guards on hand at the scene who could conceivably have contributed to his injury. *Cf. Hill v. Shelander,* 924 F.2d 1370 (7th Cir.1991) (injuries caused by prison guards); *Stubbs v. Dudley,* 849 F.2d 83 (2d Cir. 1988) (guards stood by and permitted attack to occur), *cert. denied,* 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989). Suits of this sort were expressly approved in *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), which concluded that municipalities may be held directly liable under § 1983 for official policies or customs that result in constitutional deprivations.

James challenges Milwaukee County's prison housing policy based on only one incident of an alleged constitutional deprivation. In evaluating this "single incident" claim, both parties rely on *Oklahoma City v. Tuttle,* 471 U.S. 808, 820–24, 105 S.Ct. 2427, 2434–36, 85 L.Ed.2d 791 (1985). *Tuttle,* however, addresses situations where a plaintiff that is aggrieved by a municipal employee, seeks to affix liability on the municipality. It teaches that a plaintiff generally must adduce more proof than a single incident to *infer* the existence of an unconstitutional municipal policy. Because Monell expressly rejects *respondeat superior* liability under § 1983, a "pattern" of activity by state actors must be shown to infer that a policy existed; this approach avoids pinning liability on municipalities for the random acts of municipal employees. *See Gibson v. City of Chicago,* 910 F.2d 1510, 1522 n. 20 (7th Cir.1990). However, in cases—such as this one—where there is an acknowledged municipal policy, concerns of this sort evaporate. In this case, James is not asking

strate defendants' knowledge of the likelihood of attack solely through expert testimony that the HOC housing policy was apt to cause increased inmate violence. But this is insufficient to demonstrate a risk substantial enough to warrant a finding of inferred knowledge. James offers no concrete proof, such as statistical or comparative evidence, to show this policy resulted in increased inmate violence. Indeed, the record is void of a single other instance in this prison, or any other prison, where an inmate attack was attributable to the policy of housing parole violators with probation violators. James failed to show a causal relationship between the challenged policy and the particular constitutional deprivation alleged, here physical safety. This is not a case where James had been subjected to repeated threats yet prison officials sat by idly with knowledge of those threats. Nor is it a case where a prison policy created such a pervasive risk of harm that defendants' knowledge of the risk can be inferred. Even if it was negligent or even grossly negligent for Milwaukee County to house parole and probation violators together, a reasonable jury could not have found it sufficiently reckless to be called punishment. In short, there is simply no evidence defendants were on notice of an impending risk of harm to James as a consequence of housing parole violators together with probation violators. Consequently, James fails to show defendants were so reckless that their conduct suggests intent to punish.

Our recent decision in *McGill v. Duckworth, supra,* is instructive. The plaintiff there also maintained that a prison housing policy violated the eighth amendment by providing inadequate inmate safety. McGill, a small, young prisoner, in protective custody for snitching on other prisoners, was raped in the prison showers by inmates on disciplinary status. Attacking the prisoner classification policy, he argued prison officials should have known of the inherent risk in housing small, young, pro-

tective custody inmates in a segregation unit with inmates on disciplinary status. Noting the plaintiff's failure to provide any evidence suggesting a causal relationship between this housing arrangement and increased violence—or, for that matter, any evidence of a substantial risk of harm—we concluded McGill failed to show prison officials acted with the requisite mental state. *McGill,* 944 F.2d at 350; *see also Duckworth,* 780 F.2d at 653–54 (absent evidence of any other prison bus fires, prison officials' failure to take precautions against this risk was neither deliberate nor reckless).

Likewise, in *Marsh v. Arn,* 937 F.2d 1056, 1062 (6th Cir.1991), a suit with considerable similarity to the case at bar, the plaintiff claimed prison policy permitted violent inmates to be housed in open dormitories alongside nonviolent inmates. Because the plaintiff failed to offer evidence of a pervasive risk of harm or to show a nexus between inmate classification and violence, the court held that the plaintiff failed to show defendant's housing policy amounted to deliberate indifference to inmate safety. *See also Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399 (absent evidence "double celling" increased prison violence, not the type of deprivation which evinces a desire to inflict wanton and unnecessary pain); *United States v. Michigan,* 940 F.2d 143, 158 (6th Cir.1991) (without affirmative evidence prisoner classification system contributed to inmate violence, no finding of deliberate indifference); *Inmates of Occoquan v. Barry,* 844 F.2d 828, 831–32 (D.C.Cir.1988) (district court failed to find a causal link between inmate classification procedures and the level of prison violence); *Blankenship v. Meachum,* 840 F.2d 741, 743 (10th Cir.1988) (prison officials did not act with deliberate indifference in moving plaintiff from protective custody into the general prison population); *Cody v. Hillard,* 830 F.2d 912, 914 (8th Cir.1987) (lacking evidence "double celling" increased violence among inmates, plaintiff

us to infer the existence of a policy based on the isolated misconduct of county employees—indeed, Milwaukee County acknowledges it had a housing policy that permitted confinement of

parole violators alongside probation violators. Thus, the issue here is not whether a policy existed but, whether the policy at issue inflicted wanton and unnecessary pain on inmates.

failed to show "wanton and unnecessary infliction of pain"), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988); *Ruefly v. Landon*, 825 F.2d 792, 794 (4th Cir.1987) (absent proof of a risk of harm, no deliberate indifference housing known violent inmates in the general population); *Hoptowit v. Ray*, 682 F.2d 1237, 1256 (9th Cir.1982) (incorrect classification does not itself inflict pain within the meaning of the eighth amendment); *Gibson v. Lynch*, 652 F.2d 348, 351–52 (3d Cir.1981) (plaintiff offered no evidence inmate classification system created an unconstitutional condition of confinement); *Gilland v. Owens*, 718 F.Supp. 665, 686 (W.D.Tenn.1989) (absence of a classification system cannot form the basis for an eighth amendment violation); *Grubbs v. Bradley*, 552 F.Supp. 1052, 1124 (M.D.Tenn.1982) (inmates have no constitutional claim to any particular security classification unless tied to a protected constitutional right).

*Walsh v. Mellas, supra,* provides a useful contrast. The plaintiff in *Walsh* brought a § 1983 action after being assaulted several times by his cellmate, a known gang member. As in the present case, the plaintiff in *Walsh* asserted that prison officials failed to set up adequate screening procedures for housing inmates. However, the plaintiff there showed that the defendants acted with knowledge that there was a serious gang problem in the prison, that the plaintiff was a target of the gang, and that his cellmate was a gang member. Despite this knowledge, the defendants failed to institute procedures to avoid such pairings in housing assignments. *Walsh*, 837 F.2d at 795–96. A policy that placed a gang member and a gang target in the same cell, we concluded, constituted deliberate indifference to physical safety. By contrast, James offers no such evidence of deliberate indifference.

James encourages us to establish as a constitutional baseline the comprehensive classification system recommended by his prison expert. But the Supreme Court has explicitly declined to embrace such standards as constitutional norms. "[W]hile the recommendations of [experts] may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish [recommended goals]." *Bell*, 441 U.S. at 543–44 n. 27, 99 S.Ct. at 1876 n. 27; *see also Rhodes*, 452 U.S. at 348 n. 13, 101 S.Ct. at 2401 n. 13 (expert opinion on matters of prison administration do not establish eighth amendment standard); *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir.1990) (expert opinions and professional standards, while instructive, are not determinative), *cert. denied,* —— U.S. ——, 112 S.Ct. 343, 116 L.Ed.2d 283 (1991); *Cody*, 830 F.2d at 914 (recommendations of prison experts do not establish constitutional norms); *cf. Inmates of Occoquan*, 844 F.2d at 832 ("[T]he obvious danger of employing professional standards as benchmarks is that they ineluctably take the judicial eye off of core constitutional concerns and tend to lead the judiciary into the forbidden domain of prison reform."). Moreover, in evaluating prison administrative practices, the Supreme Court has admonished judges to refrain from injecting their own subjective views into eighth amendment judgments. *See Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2398. "[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Id.* at 349 n. 14, 101 S.Ct. at 2401 n. 14; *see also Whitley*, 475 U.S. at 321–22, 106 S.Ct. at 1085 (admonishing courts to accord wide-ranging deference to officials in maintaining prison security); *Bell*, 441 U.S. at 562, 99 S.Ct. at 1886 ("The inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the constitution."). At most, James offers a theory that housing parole and probation violators together increases violence; while not without logic, absent substantive evidence that this practice breeds violence, it is not one for which the constitution provides a blanket proscription. *See Rhodes*, 452 U.S. at 348–49, 101 S.Ct. at 2400.

At any rate, even the comprehensive classification system proposed by James' expert witness is problematic. His expert acknowledged that an inmate's status as a probation or parole violator is less impor-

tant than whether an inmate has been convicted of a violent or non-violent crime. (One can, after all, be a parole violator whose underlying crime is non-violent, *e.g.,* larceny.) As the district court noted, a *per se* rule against housing together parole and probation violators is untenable for another reason. Both types of persons have recently been judged fit for re-entry into the community. Such a decision presumably negates any inference of violent disposition or propensity; parole is unlikely, after all, for those with a history of violent behavior in prison. Furthermore, both types of violators are often returned (or sent) to prison for similar reasons: minor infractions of parole or probation (such as failure to report to a probation or parole officer) which give no indication of violent tendencies. While it is true Hannah and James were initially classified in the same housing category, prison officials did have a system for removing excessively violent inmates from the general prison population. Such prisoners were classified as "code 10's" and placed in a maximum security segregation unit. Lotter Deposition at 34–35; Pilot Deposition at 32–36. After this incident, not surprisingly, Hannah found himself so classified. But prior to this incident, the record fails to show Hannah had a history of violent behavior in prison. Indeed, after serving part of his sentence, Hannah had been released into the community on parole. Further militating against a finding of recklessness, prison officials at the HOC administered a Felony Review Committee to monitor the behavior of felons with sentences exceeding one year (a category that did not include Hannah) and to recommend transfer of troublesome inmates to state prisons. Pilot Deposition at 30–31.

Because we find no evidence that Milwaukee County had knowledge of an impending risk of harm, we cannot say that it instituted this classification policy to inflict wanton and unnecessary pain on inmates. Accordingly, on the facts of this case, we find no constitutional violation in housing parole violators together with probation violators. Like the trial judge, we sympathize with James' tragic plight. But as a constitutional matter, he is not entitled to a

particular prison classification system—he is entitled, rather, to be free from policies that inflict wanton and unnecessary pain on inmates. Absent proof Milwaukee's inmate classification policy crossed that line, James' injury was not a constitutional deprivation at the hands of state actors.

AFFIRMED.