James McGRIFF, Plaintiff,

v.

Thomas A. COUGHLIN, et al., Defendants.

No. 83 Civ. 0524 (PNL).

United States District Court, S.D. New York.

July 16, 1986.

---

James McGriff, pro se.

Robert Abrams, Atty. Gen. of State of New York, New York City, for defendants.

LEVAL, District Judge.

This is an action under 42 U.S.C. § 1983. Plaintiff *pro se* James McGriff, a prisoner at Ossining Correctional Facility, seeks compensatory and punitive damages from defendants Thomas A. Coughlin, III, Com-missioner of the New York State Department of Correctional Services, Wilson E.J. Walters, III, former Superintendant, Ossining Correctional Facility ("the Prison"), together with three named [1] and other unnamed corrections officers at the prison, for failing to protect him from other inmates. Defendants move for summary judgment, contending that [1] an isolated instance of violence between inmates does not give rise to a cause of action under 42 U.S.C. § 1983, [2] the defendants' actions and omissions did not demonstrate recklessness or indifference to the plaintiff's safety and [3] defendants cannot be held liable for the actions of their subordinates. The motion is granted.

## BACKGROUND

On the evening of October 23, 1982 there was a serious disturbance at Ossining Correctional Facility during which several inmates, including plaintiff, were assaulted by other prisoners. A fight broke out between several Black and Hispanic inmates in the prison gym during the recreation period. The fight was broken up, but the tension among the inmates nevertheless mounted, and many prisoners in the gym began breaking furniture and yelling. Defendant Sergeant Enceneat, the Sergeant in charge of A Block, decided to clear the inmates from the gym in order to diffuse the tension. (Enceneat Aff. ¶ 7)

Plaintiff had been watching television on M Gallery near the entrance to the gym, and when a group of inmates rushed out the door, he was caught up in the crowd. The crowd of inmates pushed their way to the desk of the Officer-in-Charge situated in the center of the block. As they pushed from M to H gallery in A Block, plaintiff and other inmates saw the officer in charge, Defendant Peterson, standing out of the way with his back against a cell. Peterson had previously given his keys to Officer Lane and instructed her to remain at the Officer-in-Charge desk while he tried

---

**1.** Of the named officers, Sergeant Enceneat and Officers Peterson and Lane, only Enceneat and Petersen have been served.

to reach the gate near the gym to slow the flow of inmates. When the inmates arrived at the Officer-in-Charge desk, they demanded that Lane unlock the gate that led to the upper tiers where the inmates' cells were located. As was usual during the recreation period, the tiers were unguarded and the cells were locked. Lane, fearing violence, acceded to their demands. Lane states that she believed that the inmates were unarmed and seeking refuge from the violence surrounding them, and that allowing the inmates into the tiers would dissipate the disturbance. (Lane Aff. ¶ 3)

When the gate was unlocked, McGriff ran upstairs with the other inmates. When he reached the first floor landing at gallery N, five or six Hispanic inmates armed with sticks, pipes and homemade knives attacked him. Plaintiff suffered stab wounds in his thigh, contusions and back injuries. Plaintiff knows of no specific reason these inmates attacked him, but suggests that it may have been because he is Black and racial animosity was prevalent at Ossining.

McGriff claims that several unknown corrections officers witnessed his attack but did nothing to aid him. He states that during the attack he called to one Caucasion officer who was standing on the landing between N and J galleries and the officer ignored him. He also claims that three officers one floor below him on M gallery acknowledged his screams by looking towards him but did nothing to aid him. These unknown officers have not been identified or served and thus are not parties.[2] Plaintiff also alleges that Officers Lane and Peterson were informed of the attack by another inmate and did nothing to stop it. Plaintiff's only witness for this last claim admitted at his deposition that he

was unsure whether Lane and Peterson were the officers informed of the attack.

Plaintiff contends that the actions of Lane, Enceneat, Peterson and the unknown Corrections Officers were grossly negligent and demonstrated a deliberate indifference for his safety, thus violating his constitutional rights under the Eighth and Fourteenth Amendments and giving rise to relief under 42 U.S.C. § 1983.

Plaintiff's claim against Coughlin, Commissioner of New York State Department of Correctional Services, and Walters, former Superintendent of Ossining, arises from the prevailing conditions at Ossining.[3] Plaintiff alleges that security at the prison was dangerously lax and that the prison was a "breeding ground for violence." (Plaintiff's Brief, p. 3) In support of this allegation he offers the "Report to Governor Cuomo: The Disturbance at Ossining Correctional Facility, Jan. 8–11, 1983" prepared by Lawrence T. Kurlander, former Director of Criminal Justice. The Report documents the many security lapses and the high incidence of inmate violence during 1981 and 1982. Plaintiff argues that the attack against him should not be viewed as an isolated incident, but rather in the context of pervasive prison violence. In this context, he argues, defendants were aware of the risk of violence at Ossining and that as a result, the attack against him was predictable. By failing to avert it, defendants showed deliberate indifference to his safety. Thus, he contends, they were personally involved in a violation of his constitutional rights.

### DISCUSSION

▬ The standard for prisoner claims brought under 42 U.S.C. § 1983 is high. Mere negligence or lack of due care does not give rise to a claim under the Due

---

**2.** The New York Attorney General's office has interviewed by telephone almost all of the 22 nonparty corrections officers who were on duty in Block A during the disturbance. The Attorney General has not contacted the hundred or so guards who were assigned to other areas and who may have gone to Block A in response to the emergency. None of the officers spoken to remembers witnessing the attack on plaintiff.

**3.** Plaintiff's brief does not indicate if his claim of general prison violence is directed against all the defendants or merely the two in higher supervisory capacities, Coughlin and Walters. The prison guards could not be expected to shape prison policy. In any event, even against Coughlin and Walters the claim ultimately fails.

Process Clause. *Davidson v. Cannon,* —— U.S. ——, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* —— U.S. ——, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986). It remains an open question whether recklessness or gross negligence triggers the protection of the Due Process Clause. *Daniels, supra* 106 S.Ct. at 667, n. 3. A claim may be made out under the Eighth Amendment by showing the deliberate indifference of prison officials to conditions seriously risking a prisoner's health. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). At least one court has held that tolerance of pervasive violence may constitute evidence of deliberate indifference if the level of violence reaches an extreme or exceeds the norms of similar institutions. *Murphy v. U.S.,* 653 F.2d 637, 644–45 (D.C.Cir.1981) (Wald, J.).

Conditions at Ossining did not deprive plaintiff of his constitutional rights. Violence is unfortunately endemic in American prisons, and at Ossining this problem was compounded by serious security deficiencies. As the Kurlander Report documents, the security guards were inadequately trained, the inmates were inadequately supervised, and many prisoners possessed contraband weapons. In 1981 and 1982 violent assaults between inmates escalated rapidly.

■ Nevertheless, statistics indicate that violence was no more prevalent at Ossining than at most comparable prisons. The inmate assault ratio at Ossining in 1982 was 1.7% (34 reported inmate-upon-inmate assaults in an average prison population of 2,122) (Tracy Aff., ¶¶ 4–6). The inmate assault ratio at other New York State prisons ranges from .67%–2.7%. (Becker Aff. ¶ 8) The inmate-upon-inmate assault ratio for all federal prisons is 1.4%. (Becker Aff. p. 3 and Exhibit B) Thus, the level of prison violence falls within the range of violence at other comparable prisons. In this case, where the ratio of inmate-upon-inmate assaults was comparable

to those in similar institutions, the court cannot say that defendants Coughlin, Walters, or any other prison officials were deliberately indifferent to the plaintiff's need for reasonable safety measures. The Constitution does not guarantee an assault-free prison environment; it promises only reasonable good faith protection. Plaintiff offered no evidence to suggest that such protection was lacking at Ossining. Thus, the plaintiff's claims against Coughlin and Walters do not withstand those defendants' summary judgment motions.

■ As to Sgt. Enceneat, plaintiff claims that he grossly neglected his duties when he ordered the inmates to leave the gym without first ascertaining that no inmate had a weapon and that no further assaults would occur once the inmates were in a more open, less supervised area. (Plaintiff's Brief, p. 15) In ordering the inmates to clear the gym before first assuring that inmates out on the floors were in their cells, or at least carefully supervised, Sgt. Enceneat may not have made the wisest decision. Indeed, he acknowledges as much in his affidavit. (¶ 7) Nevertheless, given the tense, emergency situation and taking into account the safety of all the inmates, Enceneat's decision was not patently unreasonable. Certainly it did not amount to recklessness nor deliberate indifference to the welfare of the prisoners.

■ Plaintiff's claims against Peterson are rather confused. In his Brief and Affidavit, plaintiff points to discrepencies in the affidavits and reports of several defendants and witnesses concerning the location and actions of Peterson during the disturbance. Plaintiff argues that these discrepencies demonstrate Peterson's "unreasonable inaction" which he claims contributed to the escalation of the disturbance and led to the assault on the plaintiff. (Plaintiff's Brief, p. 17) Plaintiff offers no facts to substantiate this charge of "unreasonable inaction." Peterson's affidavit, Lane's affidavit, and the reports of Corrections Offi-

cers Kogut and Saxton do conflict in their accounts of where Peterson was during each moment of the disturbance. However, none of these accounts, nor the discrepancies between them, indicates that Peterson was "unreasonably inactive."

Plaintiff also claims that another inmate and eyewitness to the attack, Mario Ennis, informed Peterson of the attack and that Peterson failed to respond. Ennis, however, substantially retracted the statements of his initial affidavit when he was deposed. The affidavit states that while McGriff was being assaulted, Ennis ran downstairs to the clerk's office and informed Lane, Peterson and four unidentified corrections officers that the assault was occurring, but the officers did not respond. (Ennis Aff. ¶¶ 11–12) In his deposition, however, Ennis admits that he did not go to the clerk's office; (Ennis Dep., p. 49); he cannot recall if he spoke to Peterson (Ennis Dep., p. 42); and he cannot recall if he spoke to Lane (Ennis Dep., p. 42). Plaintiff failed to present any credible evidence that Peterson was informed of the attack.

It is not entirely clear that Ennis' affidavit, by itself, raises a "genuine issue," sufficient to satisfy Rule 56(e) as to recklessness or deliberate indifference on the part of prison officials. In the midst of a riot, the demands on prison officials are enormous and the circumstances chaotic. Failure to respond to an alarm such as Ennis claimed to have given in his affidavit may have many valid explanations other than recklessness or indifference. But even assuming that the affidavit by itself raises a "genuine issue for trial," its force is almost entirely undercut by Ennis' deposition. The issue that remains is more theoretical than real.

In its recent decision in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* —— U.S. ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), the Supreme Court explained that an opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to material facts." Summary judgment is not to be withheld because of an improbable possibility that the adverse party might be able to prove facts entitling him to judgment, for "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue of fact.'" *Id.* Once Ennis' affidavit had been undercut by his deposition, there remained no reasonable likelihood that plaintiff's proofs could show entitlement to judgment. This is therefore an excellent example of a case in which *Matsushita* commands that summary judgment be granted.

Finally, insofar as the complaint seeks to impose liability on defendants in their supervisory capacities, it must be dismissed. There is no *respondeat superior* liability under § 1983, and plaintiff has made no showing that defendants were reckless or deliberately indifferent in their supervision, or otherwise culpable.

## CONCLUSION

Because none of the actions of any of the defendants, either during the regular management and supervision of the prison or the night of the assault on plaintiff, demonstrates deliberate indifference to plaintiff's safety, defendants have not deprived plaintiff of his constitutional rights. Plaintiff has not made out a cause of action sufficient to meet the high standard for prisoner suits under 42 U.S.C. § 1983. Accordingly, defendants' motion for summary judgment is granted.