**IT IS FURTHER ORDERED** that defendants' motion for additional jury instructions shall be and it is denied as moot.

**IT IS FURTHER ORDERED** that all motions in limine shall be and they are denied as moot.

**IT IS FURTHER ORDERED** that American National's motion for summary judgment directed to Count II of its first amended complaint shall be and it is granted.

**IT IS FURTHER ORDERED** that defendant Michael Sims' motion for summary judgment shall be and it is denied.

**IT IS FURTHER ORDERED** that defendants Green and Murphy's motion for summary judgment on Count II of American National's first amended complaint and second amended counter claim and cross claim shall be and it is denied.

**Jeff S. SMITH, Plaintiff,**

v.

**Gary T. ULLMAN, Defendant.**

**No. 4:CV92–3083.**

United States District Court,
D. Nebraska.

June 14, 1994.

Memorandum after Recommitment for Reconsideration Aug. 31, 1994.

Judith A. Vitamvas, Lincoln, NE, for plaintiff.

Terri M. Weeks, Lincoln, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the Court on the Magistrate Judge's Report and Recommendation (filing 72). No objections to such report and recommendation have been filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

The Court has reviewed the Magistrate Judge's Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4 and finds after de novo review that the report and recommendation should be adopted and judgment entered in favor of the defendant.

As the Magistrate Judge pointed out in his thoughtful and well-reasoned report and recommendation, although the plaintiff suffered a brutal attack in an environment which did not allow him or prepare him to protect himself, nor did it make any effort to protect him in this instance, the law is such that, based on the facts of this case, the defendant cannot be held responsible for failing to protect plaintiff. While this may seem to unfair to plaintiff, and to others who experience a visceral reaction to tales of violence in the prisons, the caselaw establishes that prison officials must receive specific notice of a specific risk of harm to the inmate before they must mobilize their resources to protect him. Accordingly,

IT IS ORDERED:

1. The Magistrate Judge's Report and Recommendation (filing 72) is adopted; and

2. Separate judgment shall be entered this date in favor of defendant.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

An evidentiary hearing was held in this matter before the undersigned on April 28, 1994. The following constitutes my findings and recommended disposition of the case in accordance with 28 U.S.C. § 636(b)(1)(B).[1]

Plaintiff brought this civil rights action as a result of an alleged attack by four inmates while he was incarcerated at the Lincoln Correctional Center Evaluation Unit ("LCC–EU"). The Defendant, Gary Ullman, was employed as a Correctional Officer at LCC–EU at the time of the assault. Plaintiff alleges Defendant Ullman violated his Eighth Amendment right to be free from violent assaults from fellow inmates. I conclude that judgment should be entered for Defendant Ullman.

## FACTS

Plaintiff was assigned to LCC–EU on December 2, 1991. On December 28, 1991, plaintiff alleges he was assaulted by four other inmates: Artist Hall, Ronald Washington, Darion Love and Malcolm Weston. Plaintiff is white; the four alleged assailants are black. Plaintiff testified that he had had no prior contact with any of the assailants, but that he had been warned about Washington. Additionally, plaintiff testified that he had used the word "nigger" the previous day, and that he believes this was the reason for the assault. Plaintiff denies, however, that he called any of the alleged assailants a "nigger."

During breakfast on December 28, Darion Love approached plaintiff and told him that what plaintiff had said "wouldn't go unnoticeable [sic]." Plaintiff testified that he was not worried about Love's statement, and continued his day as usual. After lunch that day plaintiff was approached by Love and Artist Hall, who threatened plaintiff by stating that plaintiff "wasn't going to make it through the day." While this threat was entirely verbal, plaintiff testified that he took it seriously because other inmates were nearby and discussing the matter.

Prompted by this concern, plaintiff approached Corporal Joseph Byler, the correctional officer then on duty. Plaintiff testified that Byler took no action, responding that he

---

**1.** At the close of plaintiff's evidence, defendant moved for dismissal pursuant to *Fed.R.Civ.P.* 41(b). I consider the motion under Rule 52(c) as a motion for judgment on partial filings. I de-clined to rule on the motion until the close of the evidence, and I therefore consider all the evidence in reaching my conclusion below.

saw no problem. Byler testified that he was never approached by plaintiff.[2] Plaintiff returned to his cell.

Between 1:45 and 2:00 p.m. Byler was replaced by incoming correctional officer Ullman. Ullman and Byler discussed Byler's shift; both Byler and Ullman testified that the alleged threats to plaintiff were not discussed.

Plaintiff's cell door remained locked until 1:45 p.m., when doors were "run" (i.e. unlocked) to allow the inmates to exit and return. Plaintiff testified that between 1:50–1:55 p.m. he approached Defendant Ullman, now on duty, and told him that he had been threatened by Love and Hall, and asked to be removed. Plaintiff testified that he did not, however, describe the threat in more detail. Plaintiff further testified that Ullman responded that he "would keep an eye on [plaintiff]." Ullman testified that plaintiff told him he had been threatened earlier in the day, but refused to provide any further details or request removal.[3] Ullman testified that plaintiff's demeanor during this exchange was "normal" and "quiet," but that this was the first time plaintiff had initiated conversation with him at the beginning of this shift. Ullman further noted that plaintiff impressed him as being naive, in that he "didn't know what prison was like." Ullman testified that he did not believe that plaintiff's life or well being was threatened at the time.

After this exchange Ullman returned to the control room, where he examined the log book to see if any entries had been made regarding plaintiff and any alleged threat.[4] Ullman found no such entries and took no further action.

Plaintiff waited for Ullman for approximately five minutes. When Ullman did not return, plaintiff walked to the upper level of G Unit to watch television. On his way to the television area, plaintiff passed the cell of Ronald Washington. Washington began talking to plaintiff, summoning plaintiff towards his cell. Plaintiff testified that he was not concerned about Washington, as he had had no prior contact with him and assumed Washington only wanted plaintiff to hand him something or give him a light for a cigarette. Plaintiff walked to the door of Washington's cell, but did not enter. Malcolm Weston then appeared and pushed plaintiff into Washington's cell, hitting plaintiff in the upper left side of his face. Artist Hill and Darion Love then entered the cell and began beating plaintiff. Ullman testified that neither he nor the full-time control room officer saw anything of the assault. Plaintiff eventually lost consciousness.

Sometime later plaintiff regained consciousness and walked back to his cell, collapsing onto his bed and again losing consciousness. Although plaintiff's cellmate was there at the time, he apparently believed plaintiff was merely sleeping. Plaintiff remained unconscious for the next few hours. Ullman made hourly checks past plaintiff's cell, but assumed plaintiff was sleeping. Plaintiff did not regain consciousness until after supper, at which time he had his cellmate contact Ullman. The cellmate told Ullman that plaintiff had been assaulted. Ullman had plaintiff taken to the hospital. The next day, December 29, plaintiff filed an interview request seeking protection from his assailants. (Defense Exhibit 108.)

Plaintiff's injuries were extensive. Plaintiff underwent surgery on his face, after which his jaws were wired shut for two to three weeks such that he could take only liquid foods. Plaintiff lost weight, lost some

2. Byler testified that LCC–EU procedure governing an alleged threat provided that the correctional officer informed of a threat would: 1) complete an incident report; 2) enter the information in the log book; and 3) report the information to the shift supervisor. Byler testified that since he was never approached by the plaintiff, none of these measures were taken. The record shows no entry was made in the log book concerning plaintiff and any alleged threat. Diane Sabatka, Nebraska Department of Correctional Services Administrative Assistant, testified that she found no incident reports concerning plaintiff and any alleged threat.

3. Ullman testified that upon admittance to LCC–EU each inmate is provided a list of rules and regulations, one of which instructs inmates to file a "kite" to request assistance in situations such as this.

4. See note 2 supra.

feeling in his jaw, and saw a "black dot" in his left eye for some time. Plaintiff remained in the hospital for two and one-half months, after which he was transferred to the Air Park work release center.

## DISCUSSION

"Prisons are dangerous places." *McGill v. Duckworth*, 944 F.2d 344 (7th Cir.1991), *cert. denied*, 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992). However, inmates have the right to be free from violent attacks by other inmates. *Andrews v. Siegel*, 929 F.2d 1326, 1330 (8th Cir.1991). "The safety of [an] institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." *Hewitt v. Helms*, 459 U.S. 460, 473, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983).

■ To prevail on a failure to protect claim, plaintiff must show that prison officials "were deliberately indifferent to his constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates." *Branchcomb v. Brewer*, 669 F.2d 1297, 1298 (8th Cir.1982) (*per curiam*); *Andrews*, 929 F.2d at 1330.

A recent Seventh Circuit decision provides a clarifying overview of the failure to protect claim under the Eighth Amendment; I therefore quote it at length:

> Relying on identical provisions in the English Bill of Rights of 1689 and the Virginia Declaration of Rights of 1776, the Framers of the eighth amendment sought, as its words suggest, to prevent judges and legislators from imposing on citizens barbarous or "cruel and unusual" forms of punishment. *See generally* Granucci, Nor Cruel and Unusual Punishments Inflicted: The Original Meaning, 57 Calif.L.Rev. 839 (1969). Consequently, the eighth amendment has long been thought to prohibit such inhumane punishment as torture, lingering death, *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890), drawing and quartering, disembowelling, and burning at the stake. *Wilkerson v. Utah*, 99 U.S. 130, 135–36, 25 L.Ed. 345 (1879). But beyond this, the Supreme

Court has interpreted the eighth amendment "in a flexible and dynamic manner," *Gregg v. Georgia*, 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976) (joint opinion), to reach beyond the extreme physical punishments proscribed in early American history. Today it prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," *id.*, 428 U.S. at 173, 96 S.Ct. at 2925, or are grossly disproportionate to the severity of the crime. *Harmelin v. Michigan*, [501] U.S. [957], [997–99], 111 S.Ct. 2680, 2703, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring). Thus, prison conditions involving the wanton and unnecessary infliction of pain, totally without penological justification, offend the constitution. *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981).

> However, not all prison conditions trigger eighth amendment scrutiny—only deprivations of basic human needs like food, medical care, sanitation, and physical safety. *Id.; see also Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978); *Ingraham v. Wright*, 430 U.S. 651, 669, 97 S.Ct. 1401, 1411, 51 L.Ed.2d 711 (1977); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 832 (D.C.Cir.1988); *cf. Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). So, for example, a prisoner who is denied a pack of playing cards or a television set has not set out a deprivation of constitutional dimensions under the eighth amendment. Here the alleged deprivation is the right to physical safety, a right addressed by this Court on several occasions. [citations omitted].

> It is not disputed that [plaintiff's] physical safety was compromised while housed at the [defendant correctional facility]. However, to prevail under contemporary eighth amendment standards, he must prove more—namely, that the defendants acted with the requisite mental state. This area of the law, which remained in flux for some time, was recently settled by the Supreme Court in *Wilson v. Seiter*, [501] U.S. [294], 111 S.Ct. 2321, 115

L.Ed.2d 271 (1991). Because "the infliction of punishment is a deliberate act intended to chastise or deter," *Wilson*, [501 U.S. at 300], 111 S.Ct. at 2325 quoting [*Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986)] the Court concluded that intent is inherent in the use of the word "punishment." Negligence or even gross negligence is not enough; rather, plaintiffs must show actual intent or deliberate indifference on the part of state actors in order to make out an eighth amendment claim. *See* [*McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991)].

"Deliberate indifference" means recklessness in a criminal, subjective sense: disregarding a risk of danger so substantial that knowledge of the danger can be inferred. *See Duckworth*, 780 F.2d at 652. Such disregard is tantamount to intending that the injury occur. Put another way, recklessness in the context of prisoner safety requires "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *McGill*, 944 F.2d at 348 (quoting *Duckworth*, 780 F.2d at 653). A prisoner normally proves actual knowledge of impending harm by showing that he alerted prison officials to an identifiable threat to his safety. *McGill*, 944 F.2d at 349; [*Santiago v. Lane*, 894 F.2d 218, 223–24 (7th Cir.1990); *Goka v. Bobbitt*, 862 F.2d 646, 647–48 (7th Cir.1988) (tool control policy); *Walsh v. Mellas*, 837 F.2d 789, 795–96, 798 (7th Cir.), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988)]. Alternatively, a plaintiff can show, as noted above, the existence of so substantial a risk of harm that "the defendants' knowledge of the risk can be inferred." *Whitley v. Albers*, 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) (quoting *Duckworth*, 780 F.2d at 652); *see also Santiago*, 894 F.2d at 221 n. 6 (defendant acts recklessly "by consciously disregard[ing] a substantial and unjustifiable risk" of danger); *Goka*, 862 F.2d at 651 ("threat of violence is so substantial or pervasive" that knowledge can be inferred); *Estate of Davis v. Johnson*, 745 F.2d 1066, 1071 (7th Cir.1984) (to demonstrate callous indifference to inmate safety, plaintiff must show a "strong likelihood" of violence, not just a random act of violence); *accord Andrews v. Siegel*, 929 F.2d 1326, 1330 (8th Cir.1991) (to establish recklessness, must show officials faced with a pervasive risk of harm); *Moore [v. Winebrenner]*, 927 F.2d [1312] at 1315 (plaintiff must show deliberate indifference to a pervasive risk of harm); *Williams v. Willits*, 853 F.2d 586, 588 (8th Cir.1988) (plaintiff must demonstrate a pervasive risk of harm; a single incident does not demonstrate deliberate indifference); *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir.1985) (prison officials must demonstrate deliberate indifference to a pervasive risk of harm); *Fisher v. Koehler*, 692 F.Supp. 1519, 1560 (S.D.N.Y.1988) (plaintiff must show inmate violence is a substantial and widespread problem); *McGriff v. Coughlin*, 640 F.Supp. 877, 880 (S.D.N.Y.1986) (absent statistical evidence showing prison security policies resulted in increased violence, no deliberate indifference).

*James v. Milwaukee County*, 956 F.2d 696, 698–700 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992) (footnotes omitted).

The determinative issue in this case is the nature and amount of information an inmate must communicate to a prison official to alert that official to "an identifiable threat" to that inmate's safety, such that a failure to act on such knowledge would constitute deliberate indifference.

In *Robinson v. Cavanaugh, et al.*, 20 F.3d 892 (8th Cir.1994), the inmate plaintiff alleged that he had requested protective custody from defendant prison officials and had informed defendants that he feared someone would attack him. Robinson conceded, however, that he did not identify the inmates he feared would attack him. The defendant prison officials testified that they could not place an inmate on protective custody until that inmate provided the name of his potential attacker or presented "some evidence" that he was in danger. *Robinson*, 20 F.3d at 893. The district court granted defendants'

motion for summary judgment, and the Eighth Circuit affirmed. The court reasoned:

> The district court properly granted summary judgment to defendants because Robinson failed to demonstrate that defendants acted with deliberate indifference by not placing him in protective custody based on his general fear for his safety. *Cf. Ruefly v. Landon,* 825 F.2d 792, 794 (4th Cir.1987) (defendants did not act with deliberate indifference when they had no reason to know that an inmate posed a "specific risk of harm" to plaintiff). Even if defendants denied his requests for protective custody, Robinson does not dispute that he declined to identify the inmate he feared would attack him nor does he dispute defendants' contention that they would not place an inmate in protective custody without knowing the identity of the potential assailant.

*Id.* at 895.[5]

█ As such, in a "specific threat" case such as this, to demonstrate an impending threat of harm such that a failure to act on knowledge of such harm would constitute deliberate indifference, an inmate must communicate information to a prison official showing that a specific inmate or inmates pose a specific risk of harm to him—a "specific notice" requirement. *Id.; McGill,* 944 F.2d at 349; *Ruefly,* 825 F.2d at 794; *Berry v. City of Muskogee, Okl.,* 900 F.2d 1489, 1498 (10th Cir.1990); *Matzker v. Herr,* 748 F.2d 1142, 1150 (7th Cir.1984) ("The prisoner must identify who is threatening him to allow the corrections officers a reasonable opportunity to protect the threatened prisoner from harm"); *Milwaukee County,* 956 F.2d at 700.

█ There is no conflict in the testimony that plaintiff told Defendant Ullman that he had been threatened earlier in the day. The conflict concerns the specificity of that communication. Plaintiff testified that he told Ullman that Artist Love and Darion Hall had threatened him earlier in the day, and that

he requested removal. Ullman testified that plaintiff did not specify who had threatened him earlier in the day, and did not request removal. In light of this conflicting testimony I must conclude which version is more likely true. I found both plaintiff and defendant to be credible, but plaintiff's version was weakened by lack of corroboration. I conclude that plaintiff has not proven by a preponderance of the evidence that he told Defendant Ullman that Love and Hall had threatened him or that he requested removal. Thus, I consider plaintiff's claim on the basis of the general communication to Ullman that plaintiff had been threatened earlier in the day, as well as the circumstances surrounding this communication.

Defendant Ullman knew plaintiff to be a recent arrival at LCC–EU—a quiet, reticent inmate, an inmate "naive" and apparently unfamiliar with the harsh realities of prison life. Plaintiff approached Ullman with a general report of a threat earlier that day. Ullman could not remember that plaintiff had ever before approached him in such a manner. Plaintiff was not specific in his allegations, however. Ullman testified that plaintiff did not want to give him further information about the threat, and that Ullman could not force plaintiff to do so. Ullman told plaintiff he would watch out for him, returned to the control center, examined the log book, found no entries concerning plaintiff or the alleged threat, and took no further action.

Although the assault which followed was serious, and might—at least with the benefit of hindsight—have been prevented, under existing law judgment must be entered for the defendant, because of the lack of specificity concerning the identity of the potential assailants. Under *Robinson, supra, Latimore, supra,* and *Smith, supra,* it was plaintiff's burden to demonstrate that defendant actually knew plaintiff was in danger of an attack by Love and Hall. He failed to do so. I

---

5. See also *Johnson v. Beaver* (unpublished opinion), No. 93–1401, available at 1993 WL 450751, at *2 (8th Cir.1993) (correct standard is whether jail officials *actually knew* of a risk of harm to plaintiff, not whether such officials should have known of a risk) (citing *Latimore v. Widseth,* 7 F.3d 709, 715 (8th Cir.1993) (en banc) (quoting *Smith v. Marcantonio,* 910 F.2d 500, 502 (8th Cir.1990))).

shall recommend that judgment be entered for the defendant Ullman.

Having so concluded, I add some comments to suggest an alternative approach which in my view might more realistically place the burdens in such cases. In making these suggestions I must point out that the factual assumptions contained in these remarks have not been addressed by the evidence in this case and thus do not necessarily reflect the actual circumstances at the Nebraska State Penitentiary.

While a "specific notice" requirement is consistent with the culpable mental state required for Eighth Amendment liability, *Wilson v. Seiter, supra*, it raises serious concerns in practice; concerns illuminated by the facts of this case. The rationale driving the claim of failure to protect is that the state, having deprived the inmate of his liberty and means to protect himself, must assume the burden of protecting him from harm. *See* Scott Rauser, *Comment: Prisons Are Dangerous Places: Criminal Recklessness as the Eighth Amendment Standard of Liability in McGill v. Duckworth*, 78 Minn. L.Rev. 165, 178 (1993); *cf. Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Unlike the citizen, who may avoid or deter an impending assault by travel elsewhere or self-defense, the inmate must rely on an appropriate response from prison officials. In fact, an inmate who attempts to protect himself by using force would likely face disciplinary sanctions. *See*, e.g., *Jensen, et al. v. Gunter*, 807 F.Supp. 1463 (D.Neb.1992).

A "specific notice" requirement is problematic in two major respects. First, it ignores the reality that inmates commonly "hire" or seek assistance from other inmates in executing assaults; a threatened inmate does not, therefore, always know which inmate will execute the assault, even when he has good reason to believe an assault is imminent. *Rauser, supra*, at 188–89. In the present case plaintiff had no qualms approaching the cell of inmate Ronald Washington; plaintiff had no reason to know that Washington was part of the "threat" from inmates Love and Hall.

Second, and most importantly, a "specific notice" requirement effectively imposes an "absolute rule compelling snitching." *Id.* at 189. "Snitching" on fellow inmates, the practice of informing and cooperating with prison officials, is often brutally discouraged in the general population. As Rauser argues:

> Prisoners who inform authorities about particular threats from another prisoner risk retaliation not only from that prisoner but also from the general inmate population. Burdening a prisoner to specifically notify authorities constitutes a delusive guarantee of Eighth Amendment protection and inappropriately shifts the analysis from the defendant's state of mind to the plaintiff's conduct. [A specific notice requirement] blatantly overlooks the fact that prisoners often cannot notify officials about specific threats.

*Id.* at 189–90 (footnotes omitted.)

Plaintiff in this case was an inmate new to the institution, quiet, and "naive" about the realities of prison life. Plaintiff was an inmate who might understandably be concerned about "snitching" on fellow inmates. Plaintiff thus faced the inevitable "Hobson's choice" imposed by a "specific notice" requirement: not reporting the threat and facing the threatened assault; reporting the threat generally, resulting in little action and no protective custody, and being assaulted either as a result of the threat, or for "snitching," or both; specifically reporting the threat, with the risk that the resulting investigation would end short of immediate placement in protective custody, and being assaulted as a result of the threat or for "snitching," or both; or reporting the threat specifically, resulting in protective custody with its accompanying loss of freedom and programs.[6] Most of these paths lead to the infirmary.

Defendant, being presented with such a naive inmate, did what institutional policy and practice apparently required of him. That action, while conforming to institutional policy and current Eighth Amendment standards, did not prevent the assault. A re-

---

**6.** See note 9, *infra*.

sponsible correctional officer genuinely concerned about his constitutional obligation to keep plaintiff free from harm by other inmates might reasonably be expected to have done more than examine a prison log book and take no further action. Ullman could have, for example:[7] (1) questioned plaintiff further about the circumstances of the threat and plaintiff's knowledge about its origins in an effort to determine whether his concerns were legitimate; (2) ensured that plaintiff was familiar with how to request protective custody; (3) reminded plaintiff that little or no protective action could be taken without additional information about the persons involved and the circumstances; (4) directed plaintiff to go to a particular area of the unit where he could be more readily observed; and/or (5) offered to mediate the dispute giving rise to the threat in an attempt to diffuse the situation.[8]

Each of these suggested actions carries its own set of problems, of course, but then so does the present course. Placing inmates in "protective custody" upon their request without any investigation into the legitimacy of the threats punishes the targeted inmate by removing him from educational and other self-improvement programs of the institution[9] while rewarding the inmates making threats by keeping them in the general population, presumably in their prison jobs and betterment programs, and no longer bothered by the threatened inmate; in addition,

cases have documented situations where predatory inmates have manipulated the prison's system of placing inmates in protective custody, see, e.g. Butler v. Dowd, 979 F.2d 661 (8th Cir.1992) (en banc), or even placed themselves in protective custody, See, e.g. Robinson, 20 F.3d at 893; Godinez v. Lane, 733 F.2d 1250 (7th Cir.1984), in order to gain access to a targeted inmate. Likewise, allowing correctional staff to passively await an inmate's delivering the precise information to trigger Eighth Amendment protection, in addition to being unrealistic, often fails to prevent the threatened assault. That failure, in my view, may encourage other assaults as much as a failure to identify and punish the assailant.

The courts, if indeed they are serious about decrying violence in the nation's prisons, might reexamine the court-created Eighth Amendment jurisprudence which tolerates that violence. Harkening back to the "driving force" behind the Eighth Amendment's protection of prison inmates, once society has placed prisoners in confinement where they cannot protect themselves, society has a concomitant obligation to protect them from the environmental factors—including predatory persons in that environment—which pose an active threat to their well-being. Were there a "clean slate" upon which to write, I would at least consider imposing upon prison personnel the obli-

7. The evidence did not address these specific issues. Had plaintiff demonstrated that defendant was aware of the "realities of prison life" generally and in his unit particularly, and yet failed to take any of these actions, conceivably such a failure to act might amount to the "deliberate indifference" required under the present Eighth Amendment standard; I need not address that question in this case.

8. It is a fair assumption that a lack of skills in peacefully resolving minor disputes accompanies many inmates into the prison environment, and exacerbates an already charged atmosphere. It may, in fact, lie among the reasons for their incarceration in the first place. Modeling and teaching such skills might do much to provide inmates the tools to lead law abiding lives upon their release.

9. "The isolation of potential victims poses other problems. Surely society's collective conscience would be shocked if a woman were

confined in jail to protect her from being raped. Yet, is it not the same reasoning which allows a male prisoner to be administratively segregated in protective custody to protect him from homosexual rape? The issue is rarely litigated, because, in most instances, the administrative segregation is at the request of the potential victim, who presumably waived all objections to such confinement. This argument is not persuasive, however, because a valid waiver must be voluntary, which it arguably is not when prompted by prison conditions highly conducive to physical assault. Despite this, courts have ruled that there is no liberty interest inherent in the Constitution which would prevent prison officials from involuntarily transferring an inmate to protective custody for his or her protection. Similarly, there is no right to be confined in such units if prison officials do not deem it necessary."
Mushlin, *Rights of Prisoners*, Second Edition, Shepard's/McGraw–Hill, Inc., 1993, § 2.06, at 77. [footnotes with citations omitted].

gation to take some initiative in circumstances such as those presented here—a nonspecific threat—to require that the "clean heart, empty head" protection afforded prison personnel by the present standard does not enable more predatory inmates to ply their trade.

There being no legal authority for such a position at this time, however, I am bound to follow present Eighth Amendment precedent; I therefore recommend judgment be entered for the defendant.

**IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that judgment be entered for defendant.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

Dated May 24, 1994.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the Court on Magistrate Judge Piester's Report and Recommendation (filing 77).[1] No objections to such Report and Recommendation have been filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have reviewed the Magistrate Judge's Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4 and I find that the Report and Recommendation should be adopted. I note that I did not perform a de novo review of the hearing transcript or tape in this matter because no objections were filed. Inasmuch as Judge Piester has fully, carefully, and correctly found the facts and applied the law, I need only state that under *Farmer v. Brennan*, —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the

plaintiff bore the burden of proof to establish subjective recklessness on the part of defendant Ullman, and Magistrate Judge Piester found that the plaintiff adduced no such evidence.

IT IS ORDERED:

1. the Magistrate Judge's Report and Recommendation (filing 77) is adopted; and

2. separate judgment shall be entered this date in favor of the defendant.

Dated this 31st day of August, 1994.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

An evidentiary hearing was held in this matter before the undersigned on April 28, 1994. Following that hearing I recommended that judgment be entered for the defendant (filing 72) and Judge Kopf adopted that recommendation and entered judgment. (Filings 73, 74.) The next day Judge Kopf vacated that judgment and recommitted the matter to my consideration in light of *Farmer v. Brennan*, —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (June 6, 1994). I granted both parties leave to brief the specific issue of what effect (if any) the *Farmer* decision has on this court's prior report and recommendation. Both parties have now done so. Upon consideration of those briefs and *Farmer* itself, I conclude that judgment should be entered for Defendant Ullman.

To prevail on a failure to protect claim under *Farmer*, plaintiff must demonstrate four elements:

(1) a "substantial risk of serious harm" to plaintiff;

(2) that the defendant official actually knew of that substantial risk or such knowledge is inferable from the facts;

(3) the defendant official failed to respond reasonably to the substantial risk; and

---

1. On June 15, 1994, this court recommitted a prior report and recommendation (filing 72) to Magistrate Judge Piester for reconsideration in light of *Farmer v. Brennan*, —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). After the matter was recommitted, Magistrate Judge Pies-

ter gave the parties time to submit briefs addressing the issue of what effect, if any, *Farmer* had on his prior report and recommendation (filing 76). After consideration of those briefs and *Farmer*, Magistrate Judge Piester issued the report and recommendation under consideration here.

(4) plaintiff has suffered or is in imminent danger of suffering injury as a result.

*See id.* at ——–——, 114 S.Ct. at 1981–82.

*Farmer's* second element requires proof that Defendant Ullman actually knew of a substantial risk of serious harm to plaintiff. In filing 72 I concluded that because plaintiff failed to specifically identify the inmates who threatened him, Ullman had no actual knowledge of a specific, identifiable threat to plaintiff's safety, and that plaintiff therefore could not prevail.

The *Farmer* opinion, in a footnote, indicates that there is no requirement of "specific notice" to the defendant of the identity of the plaintiff's feared assailant. *Id.* at ——, n. 10, 114 S.Ct. at 1985, n. 10. Nevertheless, *Farmer* requires that the defendant have some awareness of the fact that the plaintiff faces a "substantial risk," whether the defendant knows the assailant's identity or not. *Id.* at ——–——, 114 S.Ct. at 1981–83. This formulation of the requirement would seem to cast considerable doubt on the continued vitality of Eighth Circuit cases requiring the plaintiff to enunciate a "specific threat" and to "specifically identify" the inmate from whom the threat has been received. *See, e.g., Robinson v. Cavanaugh, et al.,* 20 F.3d 892 (8th Cir.1994); *Johnson v. Beaver* (unpublished opinion), No. 93–1401, available at 1993 WL 450751, at *2 (8th Cir. 1993); *Latimore v. Widseth,* 7 F.3d 709, 713 (8th Cir.1993) (quoting *Smith v. Marcantonio,* 910 F.2d 500, 502 (8th Cir.1990)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1124, 127 L.Ed.2d 433 (1994). Viewing the evidence adduced at the hearing held before me in this light, the plaintiff was not required to prove, under *Farmer,* that Ullman knew that plaintiff faced an imminent threat from Washington, Love, and Hall; plaintiff needed to show only that Ullman had actual knowledge that plaintiff faced a substantial risk of being assaulted by someone in order to satisfy the second element of the claim.

The evidence adduced at the hearing is insufficient to demonstrate that Ullman possessed the state of mental "culpability" under the Eighth Amendment that the *Farmer* case appears to require. The evidence establishes that the plaintiff told Ullman on the day of the assault that (a) plaintiff had been threatened with physical harm earlier in the day. In addition, Ullman knew plaintiff to be (b) a recent arrival at the institution, and (c) quiet, reticent, and "naive" about the harsh realities of prison life. Ullman further knew that (d) plaintiff approached him at the beginning of Ullman's shift on the unit and (e) this was the first time plaintiff had ever approached Ullman concerning any threat.

The evidence adduced did not address the issue of what Ullman thought of these facts.[1] There was no testimony, for example, of whether he knew, "strongly suspected" (*Farmer,* —— U.S. at ——, n. 8, 114 S.Ct. at 1982, n. 8), or even weakly suspected, that plaintiff was about to be assaulted, nor what actions, if any (other than checking the log book), he had available to him to confirm his suspicions or whether he chose to forego any of them. The evidence simply did not address the defendant's subjective state of mind. While it may be conceivable that the defendant either knew additional facts giving rise to suspicion of a substantial risk, or that he deliberately chose to remain ignorant of others, any finding in that regard would be speculative, at best. The plaintiff did not request a rehearing in which to explore this issue, although he was given an opportunity to do so by the court's order of June 16, 1994. (Filing 76.)

The Court in *Farmer* suggests that the defendant may be inferred to have known the "obvious" in measuring his subjective state of

---

1. *See Farmer,* —— U.S. at ——, n. 8, 114 S.Ct. at 1982, n. 8. ("[A] prison official ... would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist....") I take this to mean that if a defendant has deliberately closed his or her senses in order to remain ignorant of facts that would have disclosed a "substantial risk," s/he may be held to have known what further inquiry would have revealed. While this appears to abandon to some extent, and in limited circumstances, the Court's adherence to its "subjective" knowledge requirement, it is a necessary exception to prevent a calculated "know nothing" defense. The Court does not elaborate on what factors may be considered or weight to be given them, in guiding the factfinder in imposing such a limited "duty to inquire."

mind, and that this inference may meet the requirements of the second element. *Id.,* at ——–——, 114 S.Ct. at 1980–81. The facts established by the evidence are recited above, but they are not buttressed with any information about the defendant's training in such situations, his knowledge of the assailants, his knowledge regarding the origins of the threat, the general state of tension on the unit, or other factors which might make "obvious" the immanence of the threat to the plaintiff. The facts recited above, taken by themselves, do not amount to an "obvious" situation of such gravity that I can infer Ullman knew Smith was about to be attacked.

In summary, I conclude that the plaintiff has failed to meet the requirements of the second element of a failure to protect claim under *Farmer,* that the defendant actually knew of a substantial risk of harm facing plaintiff. I do not reach the third element, whether defendant's response to his knowledge was reasonable.

**IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that judgment be entered for defendant.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

Dated July 22, 1994.